**John A. SANDS, Plaintiff,**

v.

**Louie L. WAINWRIGHT, Director, Division of Corrections, State of Florida, Defendant.**

**Civ. No. 71-339.**

United States District Court, M. D. Florida, Jacksonville Division.

Jan. 5, 1973.

James M. Russ, Michael F. Cycmanick, Orlando, Fla., and Walter R. Stedeford, Jacksonville, Fla., for plaintiff.

Daniel S. Dearing, Chief Trial Counsel, Dept. of Legal Affairs, and A. S. Johnston, Asst. Atty. Gen., Tallahassee, Fla., for defendant.

## ORDER AND OPINION
## OF COURT

CHARLES R. SCOTT, District Judge.

On May 12, 1971, plaintiff John A. Sands, an inmate incarcerated at the Florida State Prison [1] at Raiford, Florida, caused to be filed in the Clerk's office of this Court a *pro se,* handwritten petition which he characterized and denominated as a "writ of habeas corpus for relief and full compensation". The petition, however, was in effect a civil complaint pursuant to 42 U.S.C. § 1983 alleging violations of his civil rights. This Court on its own motion and in accordance with the pre-trial stipulation filed herein June 29, 1972, here treats the *pro se* petition as a civil complaint seeking declaratory relief pursuant to 28 U.S.C. § 2201. This Court is satisfied that jurisdiction exists. 42 U.S.C. § 1983; 28 U.S.C. §§ 1343(3) and 1343(4); 28 U.S.C. § 2201.

In his complaint the plaintiff Sands (sometimes hereinafter plaintiff and sometimes hereinafter Sands) raises basic issues regarding whether the prison disciplinary proceedings to which he was subjected afforded procedural due process to him and whether these proceedings deprived him of rights secured by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution. This Court is of the firm opinion, hereinafter expressed, that the plaintiff was not afforded procedural due process and hereinafter declares the rights and other legal relations of the parties.

Subsequent to the initiation by the *pro se* plaintiff of this litigation, this Court *sua sponte* appointed three lawyers to represent him: James M. Russ, Esquire, and Michael F. Cycmanick, Esquire, of Orlando, Florida, and Walter Stedeford, Esquire, of Jacksonville, Florida.

The Court considers this to be a significant case. Since the Florida State Prison is located within the Jacksonville Division of the Middle District of Florida, many "prisoner" civil rights suits are filed here each year. At the present rate there will be about three hundred (300) of these suits alone filed in this Division this calendar year. Although the issues presented are as varied as the methodology of the various *pro se* plaintiffs who seek to raise them, a recurrent theme is the prison disciplinary system which the several plaintiffs countless times allege to be constitutionally defective. This consideration, when coupled with the hereinafter noted recent devel-

---

1. The Florida State Prison, as it was then constituted, consisted of a complex of several buildings. The newest of the basic units was then referred to as the "East Unit" and was a maximum security facility. It housed, for example, inmates confined to "death-row" which is now, as such, non-existent.

In 1972 the Division of Corrections of the Department of Health and Rehabilitative Services of the State of Florida bi-furcated the prison into, as this Court understands it, two separate institutions of the Division of Corrections. The facility formerly known as the "East Unit" became the Florida State Prison, Starke, Florida; and the complement facilities of the remainder of the old institution was denominated as the Union Correctional Institution, Raiford, Florida (a county boundary separates the facilities).

opments in this area of the law, explains the attention afforded this case.

## I. FACTS

Plaintiff John A. Sands, a black man, is a thirty-one year old inmate who has spent the greater portion of his adult life in the prison institutions of the State of Florida. He is presently serving a fifteen year sentence for the crime of breaking and entering with intent to commit a felony. Previously, he was incarcerated for the crimes of armed robbery and attempt to escape.[2] When he first entered prison, Sands was only nineteen years of age.[3]

Sands had spent some time while a teen-age boy in institutional homes. As a result of fighting and aggressive behavior at one of these, he ultimately had to be transferred to another correctional institution. While at these institutions, Sands received no mail or visitors, and the staff ". . . could locate no interested relatives to provide him a home."[4]

Within several months of his entering the Florida State Prison on April 19, 1960, Sands was involved in the first of many incidents which resulted in disciplinary action. The prison file documents at least eleven (11) incidents which have resulted in some type of formal disciplinary action.[5] Additionally,

---

2. The attempt to escape conviction resulted in a five year sentence. The facts supporting the conviction were also those which supported a disciplinary report dated December 8, 1961, on the charge (intra-prison) of "Participation in a Disturbance" which is one of those discussed hereinafter.

3. The Court has been aided in this case by the inmate's prison file, a copy of which was introduced into evidence as respondent's (defendant's) Exhibit No. A. The file, however, is only partially reliable since it is only partially complete. For example, those reports relating to the October 13, 1970, incident, which precipitated this litigation, and which constitute its factual basis, are missing. *But see* Transcript at 32 (transcript of proceedings on July 11, 1972, filed herein July 28, 1972).

4. Respondent's Exhibit No. A (letter of Harry C. Townsend, Director of Clinical Services, Otisville Training School for Boys). Page citations to this exhibit, discussed *supra* n. 3, and *infra*, cannot be given since the file contains numerous unpaginated documents.

5. The documented incidents are:
 (1) Attempting to Steal Sugar from Messhall; November 15, 1960; Disposition: "Placed in the Flat Top on a restricted diet for an indefinite period of time, effective this date, 17 November 1960. Loss of fifteen (15) days gain time. . . ."
 (2) Fighting; April 25, 1961; Disposition: "Placed in the Flat Top on a restricted diet for an indefinite period of time, effective this date, 26 April 1961. Loss of fifteen (15) days gain time.

. . . " [The fighting was among four inmates and was accomplished with the use of iron bars as clubs.]
 (3) Talking and Laughing in Dining Room; September 17, 1961; Disposition: "Given another chance. Dismissed."
 (4) Disobedience of Rules and Regulations; August 28, 1961; Disposition: "Meditation restricted diet for an indefinite period of time, effective this date 29 August 1961. Loss of ten (10) days Gain Time. . . ." [Sands was talking in a "loud and boisterious" manner in hallway enroute to the Dining Room after having been warned not to do so.]
 (5) Disobeying a Direct Order; October 4, 1961; Disposition: "Placed in Meditation for an indefinite period of time, effective this date, October 5, 1961" and loss of fifteen (15) days gain time. [Sands was "talking and laughing in a very loud tone of voice with another inmate" while on P–Wing South.]
 (6) Participation in a Disturbance; December 8, 1961; Disposition: "To be placed in Meditation for an indefinite period of time this date, 8 December 1961" and loss of "ALL" gain time. ["All" gain time at that date was forty-four (44) days. The disciplinary report also noted that "[a]n investigation is being conducted to determine if sufficient evidence to prosecute in civil court." This incident resulted in Sands' "Attempt to Escape" conviction. The reports reflect that three prison officials were taken hostage in this attempted escape.]
 (7) Attempted Assault of an Inmate and Disrespect Towards an Officer; December 30, 1961; Disposition: "To be placed in Meditation for an indefinite

it is clear that Sands has been placed in administrative segregation under disciplinary circumstances. For example, in a Report of Administrative Segregation dated December 17, 1971, the "institutional Disciplinary Committee" assigned Sands to administrative segregation status for his alleged involvement in a racial incident in the East Unit School.

Further, the Court notes that, as is indicated within a section of his prison record denominated as "Punishment Record", the prison authority apparently itself not only at least sometimes considers confinement in administrative segregation to be punishment but also assignment to the East Unit itself as a form of punishment.[6]

period of time this date, 16 January 1962" and loss of "ALL" gain time.

(8) Disobeying Orders—Creating Disturbance on the Wing; January 5, 1964; Disposition: "To be placed in Meditation for an indefinite period of time this this [sic] date" and loss of "ALL" gain time. ["ALL" gain time was at that date two hundred fifty-four (254) days. As a result of some disagreement between the two individuals involved, Sands was reaching out of his cell door and throwing water out of cup toward the other inmate and his cell.]

(9) Fighting with Another Inmate; June 18, 1968; Disposition: "Dismissed". ["Investigation of Offense" section provides that "[i]nmate SANDS admits the above offense. Stated inmate MOORE was playing with him and would not let him [Sands] Watch T.V."]

(10) Instant incident hereinabove discussed and the subject matter of this litigation.

(11) Withholding a Razor Blade: Illegally Exchanging a Razor Blade; March 27, 1972; Disposition: "Inmate was assigned to Punitive Segregation on a Regular Diet."

This Court notes with interest that, with regard to the first seven disciplinary reports, the report of the investigating officer was almost invariably entered in the following detailed form "I have investigated the above and found it to be true and correct."

6. The following appears on Sands' DC–7 form:

Punishment Record

| Date Confined | Penalty | Charge and Details | Date Out |
|---|---|---|---|
| 12/28–67 | East Unit (MS) | Security Reasons | 4–4–68 |
| 7–1–69 | Adm. Seg. | Disrespect toward an officer, Lying to an officer and Refusal to obey a Direct Order. | |
| 11–20–70 | Pun. Seg. | Assault on other inmates Creating a racial disturbance. LGt–120 days. | 12–17–70 |

Also, of incidental interest to this Court is the fact that within Sands' Reclassification and Progress Report dated July 23, 1964, there appears the entry "[s]ubject has no writs on file at present." Within the January 6, 1965, Reclassification and Progress Report there is the entry "Writs: None." On the December 14, 1967, Reclassification and Progress Report there is the entry "Motions Filed: None." On the March 19, 1970, Reclassification and Progress Report there is the entry "Motions Filed: None." More recent reports do not appear in the Court's "copy" of Sands' prison file. Apparently, in the opinion of the Division of Corrections, there is some significantly noteworthy importance attached to the fact of whether an inmate is a party to litigation. It would therefore appear that such data would be relevant either to the inmate's "classification" or "progress". The relationship appears doubtful at best. More importantly, and in view of the chilling effects which this procedure may tend to have on inmates' attempts to seek relief from their sentences and to vindicate alleged violations of their civil rights, these notations may be constitutionally impermissible as they tend to deny access to the courts. *See generally* Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969). However, this issue is not presently before this Court.

Sands filed this case as a result of a disciplinary report dated November 16, 1970, in which he was charged with "assault on other inmates" and "creating a racial disturbance".[7] The parties have

7. This Disciplinary Report is standardized throughout the Division of Corrections and is accomplished by completing form DC-1.

The Disciplinary Report which is incident to the facts giving rise to this litigation was filed on June 1, 1971, in this Court as an exhibit by respondent (defendant) pursuant to this Court's show cause order. It provides in part:

DC-1 (REV. 2-70 Florida Division of Adult Corrections
 Disciplinary Report

Institution: Florida State Prison—E. U. Date: November 16, 1970

Work Detail: School Inmate Name: SANDS, John

Number: 007618-C Quarters: N-2-S-17

---

I. CHARGES (Nature of Offense): Assault on other inmates

Creating a racial disturbance

Date of Offense: October 13, 1970

Statement of Facts (State fully the exact facts and circumstances of the offense):

The above subject inmate was involved in an assault on several white inmates in the School area on October 13, 1970 which resulted in five white inmates being hospitalized. This incident was the result of the incident which happened in the Tobacco Factory earlier on the same date. (See Special Investigation Report of Mr. R. P. McLandon, Prison Inspector and Investigator, Mr. E. E. Smith, Prison Inspector and Investigator, and Lieutenant R. K. Griffis, Investigating Officer, FSP for complete details).

Reported by: [Signature] School Instructor
 (signature of Reporting Officer(s)) (title)
 MICHAEL SCHALLERN

II. DELIVERY OF CHARGES: I hereby certify that on this 17 day of November, 1970, I have served notice on this inmate that he will be given a hearing on this charge before the disciplinary committee, and I have given him a copy of the charges.

Date: November 17, 1970 Delivering Officer: [Signature]
Lieutenant (signature)
(title) R. CHESSER

III. REPORT OF INVESTIGATION:

A complete and thorough investigation was conducted by myself and Mr. E. E. Smith, Prison Inspector and Investigator and our investigation revealed that inmate Sands was involved to the extent of inflicting bodily harm to the assaulted inmates. See our investigative report for complete details.

Date: November 17, 1970 Investigated by: [Signature]
 (signature)
Investigator, FSP R. K. GRIFFIS, LT
(title)

IV. DISCIPLINARY COMMITTEE ACTION:

Date of Action: November 20, 1970 Inmate's Plea: Not guilty

Finding and Action of Committee: (Explain Action)

stipulated and admitted the following facts: [8]

(a) On November 16, 1970, the petitioner was furnished with a written disciplinary report signed by school instructor Michael Schallern charging the petitioner with the offenses of (1) assaulting other inmates, and (2) creating a racial disturbance.

(b) On November 17, 1970, the petitioner was taken from maximum security to stand trial before the East Unit Disciplinary Committee on these charges. Disciplinary committee action was postponed to November 20, 1970.

(c) On November 20, 1970, the disciplinary committee was again convened and the petitioner was brought before it. The petitioner generally alleged that he was not guilty of the charge. After denying petitioner's request for his "rights", the petitioner was found guilty of the charges. The committee took one hundred and twenty (120) days of gain time from his record and ordered that he be confined in punitive segregation on a special diet. The petitioner was confined to punitive segregation on Q–Wing of the East Unit and held there on the special diet for twenty-eight (28) days. The petitioner was thereafter placed in a maximum security wing, and at the time of filing the instant proceedings, had not been released to open population on the East Unit.

(d) The petitioner wasn't provided with an attorney or legal counsel in connection with these proceedings and wasn't advised of his right to be protected from compulsory self-incrimination.

(e) The person who filed the written charges against the petitioner did not testify in the course of the Disciplinary Committee proceedings.

(f) The petitioner in this cause is black; the East Unit Disciplinary Committee does not have blacks in its membership.

In addition to the foregoing stipulated facts, the defendant called J. C. Combs [9]

Inmate found guilty as charged. Inmate placed on Punitive Segregation for an indefinite period on a special diet.

Number Days Loss of Gain Time Recommended: 120.

[Signature of J. C. Combs]
(Disciplinary committee member signature)

[illegible]
(Disciplinary committee member signature)

Signed: [Signature of J. F. Tompkins]
(Chairman, disciplinary committee)

. . . .

Approved: [Signature of L. D. Hassfurder]
(Superintendent)

V. CENTRAL OFFICE:

. . . Concur in recommendation. Approve loss of 120 days gain time.

Date: 11 25 70

Approved by: [Illegible]
(Deputy Director for Inmate Treatment)

. . . .

8. Pre-trial stipulation at 4 (filed herein June 29, 1972).

9. J. C. Combs, a uniformed officer, holds the rank of Captain at the Florida State Prison and is employed there as Chief Correctional Officer, a position of significance. The Court has had exposure to this witness heretofore and gives considerable weight to his credibility and understanding of the prison.
Combs' testimony is supplemented by his affidavit which was filed herein July 11, 1972.

as his only witness at the trial of this case on July 11, 1972.[10]

Combs testified that, before the initiation of the disciplinary proceedings of November 20, 1970, which constitute the subject matter of this litigation, Sands was being held in administrative segregation. Sands had been placed there on October 13, 1970, while investigation was completed on the intra-prison charges which on November 20, 1970, resulted in the disciplinary action.[11] Combs further testified that Sands did not have any type of hearing or appearance before any disciplinary committee prior to or concomitant with his confinement in administrative segregation.[12]

Wings N, P, R and S of the East Unit are those which are presently utilized for administrative segregation.[13] These cells are the same type as those heretofore utilized on two wings which then housed the "death-row" inmates.[14] Q–Wing is the punitive segregation area.[15] Combs testified that the distinction between "administrative" and "punitive" segregation is that, while in the latter status, an inmate can be placed on a special diet and does not have visiting privileges.[16] Further, his mail privileges are restricted, except for "legal mail".[17] With regard to bedding, an inmate in punitive segregation has a mattress; and with regard to clothing, the inmates have the same clothing as when confined in administrative segregation status.[18]

The disposition of the November 20, 1970, disciplinary committee hearing was that Sands was placed in punitive segregation for an indefinite period on a special diet and that he lost one hundred twenty (120) days of gain time. He was physically placed on Q–Wing, west side in cell number 3.[19] This cell was at that time, and perhaps still is, a "strip cell". These cells are furnished with only tiled walls and floor, a light bulb and a flushable drain (a hole in the floor) which is termed an "oriental

10. Plaintiff called no witnesses and was content, factually, to rely on the pre-trial stipulation.

11. Affidavit of J. C. Combs at 1 (filed herein July 11, 1972).

12. Transcript (hereinafter "TT") at 41 (transcript of proceedings of Tuesday, July 11, 1972, filed herein July 28, 1972); *see also* TT at 43.

13. TT at 19.
However, the Court notes that sometimes cells in these wings may be used for punitive segregation. For example, in Sands' prison file there are notations on a DC–36 form which indicate that commencing with April 4, 1972, Sands was held in a cell on "S" Wing in a punitive segregation status.

14. TT at 19.
There are no issues in this case which are properly before this Court with relation exclusively to the "death-row" inmates. *See generally* Adderly v. Wainwright, 272 F.Supp. 530 (M.D.Fla.1967); Adderly v. Wainwright, 58 F.R.D. 389 (M.D.Fla.1972).

15. TT at 19.

16. TT at 20.
In administrative segregation the inmates have the same visiting privileges as in general population.

The Court notes that the Florida Division of Corrections cautions, perhaps caustically, its personnel not to refer to the special diet as "soup". *See* Florida Division of Corrections—Inmate Treatment Directive No. 5 at 2 (issued June 1, 1972).
The Court notes that, even if the inmate confined in disciplinary segregation is not placed on a "special diet", he nonetheless receives less food than those inmates confined in general population. *See* Florida Division of Corrections—Inmate Treatment Directive No. 5 at 12.

17. TT at 21.
The First Amendment issue is not before this Court in this litigation. However, the broad scope of censorship at the prison is before this Court in the pending case of Rankin v. Tompkins, Case No. 72–322–Civ–J–S.

18. TT at 21.
In this case there are no issues before this Court with regard to conditions which might be alleged to be violative of the Eighth Amendment in that they constitute cruel and unusual punishment except for the discussion in text at the end of this opinion. This Court intimates no opinion as to whether conditions in solitary confinement, or elsewhere, constitute cruel and unusual punishment.

19. TT at 22–23.

commode".[20] The drain is flushable not by the inmate but by the custodial officers. Although the inmate is physically restrained from exiting the cell by a barred wall and door, there is also an outer door which, if closed and if the light is cut off by the switch which is controlled by the custodial officer, can eliminate all light from the cell.[21]

Sands spent twenty-seven (27) consecutive days in punitive segregation and on December 17, 1970, was released therefrom and transferred to administrative segregation status.[22] There was no hearing before the disciplinary committee concerning his placement in administrative segregation, although Combs imagined ". . . it was discussed with him right at his cell."[23]

Administrative segregation itself is a type of solitary confinement: the inmate is confined in a cell by himself.[24] In the East Unit these numerous cells are each approximately six and one-half feet (6½') by nine and one-half feet (9½').[25] Three of the walls are blank, steel walls; and the fourth is a barred wall and doorway.[26] The cell opens onto a walkway and, in turn, overlooks a wall of clear windows.[27] The cell blocks within which these cells are located are the outer well type.[28]

Each cell in administrative segregation is equipped with a bed and bedding, a toilet and a washbasin with hot and cold running water, both of which are controlled by the inmate.[29] Each cell has a radio speaker; and, if the radio system is turned on by the responsible custodial officers, the inmate can select either of two channels which have in turn been selected by the responsible custodial officers. Alternatively, the inmate can turn it off.[30] Lighting is provided by a single bulb which is controlled by the correctional officers.[31] In administrative segregation the inmate is provided with coveralls and shower slides (shoes) as his clothing.[32] These are changed two times a week.[33] Inmates on administrative segregation are not restricted with regard to diet and receive the same rations as those in general population.[34] Each and every meal is served and consumed in the cell.[35] A "member of the Medical Department" sees the several inmates confined in administrative segregation each forty-eight hours.[36] While in the cell the inmate may converse with those others close to him.[37]

While confined in administrative segregation, the inmate never gets out of

20. TT at 24.

21. TT at 16, 24–26. *See* note 18 *supra*. These "strip cells" were the subject matter of litigation before this Court in the case Williams v. Wainwright, 350 F.Supp. 33 (M.D.Fla.1972). The final judgment in that case, to which the parties consented, enjoins the usage of strip cells for punitive detention.

22. TT at 27 and 30; Affidavit of J. C. Combs at 2 (filed herein July 11, 1972).

23. TT at 41–42; *see also* TT at 43.

24. TT at 12 and 34.

25. TT at 13 and 35.

26. TT at 35.

27. TT at 35 and 37–38.

28. TT at 35.

29. TT at 13–14.

30. TT at 14.

31. TT at 14 and 38.

32. TT at 14; *but see* Florida Division of Corrections—Inmate Treatment Directive No. 5 at 13.

33. TT at 14; Florida Division of Corrections—Inmate Treatment Directive No. 5 at 13.

34. TT at 15.

35. TT at 35.

36. TT at 20. It is not clear whether the phrase "member of the Medical Department" is exclusive of all those other than medical doctors or, alternatively, whether it includes such persons as medical technical assistants and inmates who have been assigned some duties in this area. These medical issues are not before this Court in this case. However, these are issues in Costello v. Dugger, 353 F.Supp. 1324, and related pending litigation before this Court.

37. TT at 15.

the cell for exercise;[38] he never gets out of the cell for sunshine;[39] he never gets out of the cell to go to work;[40] he never gets out of the cell to go to Church;[41] he never gets out of the cell to go to school;[42] he never gets out of the cell to go to the T.V. room;[43] and he never gets out of his cell go to the prison law library.[44]

Each week an inmate confined in administrative segregation is taken out of his cell three times to take a shower.[45] The time interval allowed is between three and ten minutes, and during this period the inmate must go to the shower room, take a shower and come back.[46] And, while confined in administrative segregation, an inmate cannot see the other inmates on the wing.[47]

As regards the disciplinary hearing procedure, Combs testified that Sands was simply afforded an opportunity to appear before the disciplinary committee and then removed.[48] He was not present to hear any other testimony if

any was introduced.[49] And, Combs testified that he could not remember whether Michael Schallern, the accuser, was present at the hearing.[50] Combs testified that a court reporter is not present at a disciplinary proceeding and that there is no record made of what happens at the proceedings.[51] However, notice of the charge is given to the inmate prior to the hearing.[52]

In accordance with F.S. § 945.21, F.S. A.[53] the Division of Corrections of the Department of Health and Rehabilitative Services of the State of Florida has adopted, as of December 1, 1971, certain Administrative Rules and Regulations governing the Division.[54] Chapter 10B–3.06 of those rules and regulations is entitled "Discipline" and it, *inter alia,* provides for punishments which may be imposed by a disciplinary committee, the procedure to be utilized upon violations, certain rules to which the inmates must adhere, and minimum specifications for disciplinary cells.[55] Pursuant to the

38. TT at 35.

39. TT at 36.

40. TT at 36.

41. TT at 36. Questions involving these religious issues are presently before this Court in the pending case Rankin v. Tompkins, Case No. 72–35–Civ–J–S.

42. TT at 36.

43. TT at 36.

44. TT at 36. The prison does, however, provide procedures for bringing legal materials to the cell.

45. TT at 36–37.

46. TT at 37.

47. TT at 37.

48. TT at 79.

49. TT at 79.

50. TT at 80–81. Michael Schallern, a school instructor at the prison, was the person who signed the charges on the disciplinary report which initiated the disciplinary proceedings. *See* note 7 *supra.*

51. TT at 74 and 78.

52. TT at 75. The actual notice given Sands was introduced into evidence as petitioner's Exhibit No. 1 (filed herein July 11, 1972). It is a carbon copy of

the Disciplinary Report (DC–1 form) down to and including part I thereof. *See* note 7 *supra.*

53. F.S. § 945.21, F.S.A., provides in part that:
(1) The division is authorized to adopt and promulgate regulations governing the administration of the correctional system and the operation of the division. In addition to specific subjects otherwise provided for herein, regulations of the division may relate to:
(a) Conduct to be observed by prisoners;
(b) Punishment of prisoners;
(c) Gain time for good conduct of, release payments to, and release transportation of, inmates;

. . . . . .

(i) Visiting hours and privileges. . . .
*See also* F.S. § 945.04, F.S.A.

54. These were introduced into evidence as respondent's Exhibit No. C (filed herein July 11, 1972).

55. Chapter 10B–3.06 provides:
10B–3.06 Discipline.
(1) The Director shall authorize the composition of a committee at each correctional institution which shall administer discipline and shall authorize punishment for violation of any departmental, divisional, or institutional rules and regu-

lations by an inmate; provided, however, that such authority to punish shall be subject to the approval of the superintendent and the Director as hereinafter provided.

(2) For violation by an inmate of any such rule or regulation, the disciplinary committee may impose any or all of the following disciplinary measures:

(a) Reprimand, probation, or action suspended.

(b) Loss of mailing and/or visiting privileges for such period as the committee feels justifiable.

(c) Loss of any other privileges as the committee feels justifiable to include extra duty assignment during leisure hours.

(d) Assignment to diciplinary squads.

(e) Placement in disciplinary confinement on a part-time basis on regular rations and continue on a work detail.

(f) Placement in disciplinary confinement on either regular rations or special diet.

(g) Recommend loss of amount of gain time as the committee may feel is justified in each case.

(3) Upon any violation by an inmate of such rules or regulations, a detailed written report shall be made by the employee or employees who have knowledge of such violation. Said report shall be investigated and forwarded to the designated committee. The committee shall hold a hearing with the inmate present to determine whether or not such inmate is guilty of such violation. The committee may call before it any persons having knowledge of the violation, or may postpone action pending further investigation. The committee shall make a written report to the superintendent of its findings together with its recommendations for punishment of the inmate, if any. The superintendent may approve, disapprove, or modify the findings or recommendations of the committee or may refer the matter for further investigation and shall so indicate on said written report. The written report together with the approval, disapproval, or modification of the superintendent shall then be forwarded to the Director who may approve, disapprove, modify the terms thereof or refer for further investigation. Copies of the written report shall be maintained in the inmate's record jacket and shall also be forwarded to the Florida Parole and Probation Commission.

(4) Corporal punishment shall not be administered to any inmate.

(5) No leg irons or handcuffs shall be used on any inmate except as a means of restraint only and not as punishment.

(6) Inmates shall not engage in gambling activities or use profane language or act or speak in indecent or obscene manner.

(7) Inmates shall not engage in any form of abnormal sexual activity.

(8) No inmate shall engage in or incite or encourage another inmate to engage in any strike, riot, or disturbance, or incite or encourage any other inmate to violate any rule or regulation of the Department, the Division, or the institution.

(9) No inmate shall refuse any assignment given him.

(10) No inmate shall be placed on a special diet to such extent as to endanger his health.

(11) When needed, each institution shall be provided with cells to be used for disciplinary confinement. Existing disciplinary confinement cells shall have a floor space of not less than five feet by seven feet (5' X 7') and a ceiling height of not less than seven feet (7'). They shall be equipped with proper sanitary facilities and drinking water, necessary ventilation and heat, and protection from the weather. Disciplinary confinement cells in institutions constructed after the adoption of these rules and regulations shall not be less than six feet by nine feet (6' X 9') and a ceiling height of not less than eight feet four inches (8' 4"). Such disciplinary confinement cells shall be equipped with security toilet fixtures, facilities for drinking water, necessary ventilation and heat and protection from the weather.

(12) An inmate in disciplinary confinement shall be furnished with a mattress and with sufficient blankets to keep his body warm.

(13) The superintendent, officer-in-charge, or his designated representative shall see and talk to each inmate in disciplinary confinement at least once each morning and once each afternoon. At each of these times, the inmate's general condition and attitude shall be ascertained and noted in writing. The report is to be signed and shall be made available to prison inspectors upon request and placed in the inmate's file.

(14) An inmate may be deprived of clothing, bedding, or other comfort items in order to prevent him from inflicting injury to himself or others or to prevent destruction of property or equipment. A record of such deprivations must be maintained by institutional personnel.

(15) The superintendent or officer-in-charge shall report criminal offenses committed by inmates to the appropriate prosecuting attorney.

(16) The institution physician, or a representative of the medical staff, shall see

above cited statute and Chapters 10–B3 and 10–B4 of the above cited Administrative Rules and Regulations, the Division of Corrections has promulgated Inmate Treatment Directive No. 5 dated June 1, 1972.[56] Its subject is "discipline". Combs testified that these sources constitute the entirety of rules relating to discipline at the prison and that there are no oral regulations or rules that vary them.[57]

On the basis of these official documents, the prison file of the plaintiff Sands, the pre-trial stipulation, and the testimony taken at the trial, this Court hereby specially enters the following specific findings of fact:

1. An inmate confined in administrative segregation status is not necessarily afforded a hearing, notice or any other rights whatsoever concomitant with his placement in such status.

2. An inmate charged with an offense in a disciplinary report is given notice of the charge prior to a hearing before a disciplinary committee. Such notice is delivered to him. There is no minimum time period required between the delivery of the charges and the hearing.

3. An inmate charged with an offense in a disciplinary report is afforded a hearing before a disciplinary committee, is there given an opportunity to enter a plea of guilty or not guilty, and is there given an opportunity to state his case.

4. An inmate charged with an offense in a disciplinary report has no right to
 a. present evidence,
 b. call witnesses in his behalf,
 c. confront his accuser,
 d. confront his accuser's witnesses,
 e. counsel or counsel substitute,
 f. cross-examine adverse witnesses,
 g. a public hearing,
 h. an appeal,
 i. invoke a privilege against self-incrimination, or
 j. a record of the proceedings.

5. An inmate charged with an offense in a disciplinary report has no meaningful protective devices available to him that will insure
 a. that he will receive a fair hearing at a meaningful time and in a meaningful manner, or
 b. that he will be heard by an impartial fact finder and decision maker, or
 c. that he will receive a decision based on the evidence, or
 d. that there will be a record sufficient to justify the disciplinary committee action.

## II. DEFINITIONS

Hereinafter in this opinion, this Court hereby declares the term "administrative segregation", including "administrative segregation status", to mean that type of segregated confinement to which an inmate may be assigned or placed which constitutes

(1) administrative segregation as the prison authority itself defines it, and/or

(2) any and all types of solitary (that is to say, one man to one cell) confinement which results in a significant loss to the affected in-

---

and examine every inmate held in disciplinary confinement status not less than once every seventy-two (72) hours and shall furnish written reports of the inmate's condition upon each examination. Should the physician determine at any time that continued confinement would endanger the health of the inmate, then the inmate shall be relieved immediately of such status to the extent recommended by the physician. In such cases a written report shall be made to the superintendent by the physician.
*See also* TT at 52.

56. This document was introduced into evidence as respondent's Exhibit No. B (filed herein July 11, 1972).

57. TT at 49.

mate of privileges which he would enjoy if assigned to general population in the institution.

Hereinafter in this opinion, this Court hereby declares the term "punitive segregation", including "punitive segregation status", to mean that type of segregated confinement to which an inmate may be assigned or placed which constitutes

(1) punitive segregation as the prison authority itself defines it, and/or

· (2) any and all types of solitary (that is to say, one man to one cell) confinement, whether part-time or full-time, which are accompanied by

(a) "regular" or "special" rations as defined in Inmate Treatment Directive No. 5 dated June 1, 1972,

(b) the loss of gain time, extra gain time, special gain time, or gain time in advance,

(c) the loss of visiting privileges, or

(d) any other loss of a substantial privilege which is afforded as a normal matter to an inmate confined in administrative segregation as it is hereinabove defined.

### III. DUE PROCESS WITHIN THE PRISON

When a person is committed by a court of competent jurisdiction to the appropriate custodial authority, he suffers some losses of rights and privileges. For example, he is not entitled to the right of liberty.

The prison world, a closed society unto itself, is a highly structured place wherein, in order to promote discipline and compel structure, the prison authority utilizes both the carrot and the stick (rewards and punishments). Thus, in order to encourage behavior considered desirable, the prison authority can utilize untold numbers of rewards and privileges for desirable conduct. What the common, free man may take wholly for granted can quite obviously become a coveted privilege within the context of the prison society. On the other hand, the authority can associate undesirable conditions with nonconforming behavior.

Of course this is not merely historically evident but understandable. Those persons convicted of crime have a *fortiori*, been unable to conform to socially acceptable norms written into law by the society from whence they came; in short, they could not meet the minimal requirements of the free world. Consequently, a more highly structured society may be one which more conveniently accommodates the promotion of socialized behavior. Secondly, the prison authority, although superior in its authority and possessed of the initiative, is itself possessed of only limited resources. Only a few must control the very many. Therefore, simply in order to maintain control of the prison society generally and of its individual constituents on a day-by-day basis, it becomes necessary for those entrusted by the state with the custodial function to utilize rewards and punishments.

These methods of maintaining control have been, perhaps unwittingly, further necessitated by the supporting society. This society, as it speaks through its legislative bodies, seems only most interested in forgetting about its prisoner problems even though social conditions may have environmentally occasioned their existence. This does not appear to be the fault of the prison authority which, year after year, continues to knock unsuccessfully at the appropriative door.

Additionally, the courts have played a role, for they have traditionally accepted a non-interference policy which has been characteristically of the very broadest scope. Subsequent to the commitment of a person to the appropriate custodial authority, the courts have historically and simply refused to consider most of the conditions of incarceration. Indeed, it is surprising that the courts have so

delineated their authority within the spectrum of what we refer to as the "criminal justice system". It would rather seem that the courts should consider themselves to have some basic type of continuing responsibility. The idea seems to have developed that, although justice vigilantly protects the accused through conviction, it subsequently becomes truly blind to all but the most outrageous conditions of confinement. Consequently, the prison authority, left without significant monetary resources for qualitative rehabilitative programs and responsible to a society which basically only asks that it "hold the line", has had few, if any, alternatives to its social structure.

### A. The Rights/Privileges Distinction in the Prison

Because of the prison structure, inmates have generally been thought to be without a portfolio of rights. Most benefits and advantages have been considered to be matters of privilege, not right, which the prison authority may in its broad discretion distribute to deserving inmates. This Court has no quarrel with the prison authority's right to grant, as matters within its discretion, whatever privileges it deems appropriate to those within its custody. However, once a privilege is granted, it becomes, to some extent at least, vested. Once the privilege is granted, the inmate is entitled to it. Thus, in terms of constitutionally permissible distinctions, there is no distinction between "rights" and "privileges". This doctrine is applicable within the prison context and is one application of

. . . the general proposition that relevant constitutional restraints limit state power to terminate an entitlement whether the entitlement is denominated a "right" or a "privilege."

Bell v. Burson, 402 U.S. 535, 539, 91 S. Ct. 1586, 1589, 29 L.Ed.2d 90 (1971); Goldberg v. Kelly, 397 U.S. 254, 262, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (withdrawal of welfare benefits); Shapiro v. Thompson, 394 U.S. 618, 627 n. 6, 89 S. Ct. 1322, 22 L.Ed.2d 600 (1969) (denial of welfare assistance); Sherbert v. Verner, 374 U.S. 398, 404, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) (disqualification for unemployment compensation); see Slochower v. Board of Higher Education of the City of N. Y., 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956) (discharge from public employment); Escalera v. New York City Housing Authority, 425 F.2d 853, 861 (2d Cir. 1970) (termination of tenancy); cf. Keyishian v. Board of Regents, 385 U.S. 589, 605–606, 87 S. Ct. 675, 17 L.Ed.2d 629 (1967) (removal of faculty member); Speiser v. Randall, 357 U.S. 513, 518, 78 S.Ct. 1332, 2 L. Ed.2d 1460 (1958) (denial of a tax exemption); Kwong Hai Chew v. Captain Svend Colding, 344 U.S. 590, 601, 73 S. Ct. 472, 97 L.Ed. 576 (1953) (resident alien denied permission to land). See also Willner v. Committee on Character & Fitness, 373 U.S. 96, 83 S.Ct. 1175, 10 L.Ed.2d 224 (1963); Greene v. McElroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959); Opp Cotton Mills v. Administrator, 312 U.S. 126, 61 S.Ct. 524, 85 L.Ed. 624 (1941); Goldsmith v. Board of Tax Appeals, 270 U.S. 117, 46 S.Ct. 215, 70 L.Ed. 494 (1926); Londoner v. Denver, 210 U.S. 373, 28 S.Ct. 708, 52 L.Ed. 1103 (1908); Hornsby v. Allen, 326 F.2d 605 (5th Cir. 1964); Van Alstyne, The Demise of the Right-Privilege Distinction in Constitutional Law, 81 Harv.L.Rev. 1439 (1968). Thus, the relevant constitutional restraint, i. e., procedural due process, comes into play when the entitlement, a privilege theretofore granted to the inmate, is to be taken away. For example, once an inmate is assigned the privilege of living in general population with all of its concomitant benefits, he is entitled as a matter of right to procedural due process before he is placed in punitive segregation. This unquestionable rule would appear to be implicitly recognized by the defendant, and it has been applied by other courts in the prison context. See, e. g., Gray v. Creamer, 465 F.2d 179, 185 (3d Cir. 1972); Sostre v. McGinnis, 442

F.2d 178, 196 (2d Cir. 1971); Landman v. Royster, 333 F.Supp. 621, 644–645 (E.D.Va.1971); Carothers v. Follette, 314 F.Supp. 1014, 1027 (S.D.N.Y.1970).

### B. Constitutional Limitations on Valid Governmental Purposes

■ Even though there may have been a strong historical policy of judicial non-interference in the administration of prisons and in their internal disciplinary proceedings, this in itself is no sufficient basis for a continuing disregard for constitutionally protected rights. Clearly, vindication of constitutionally protected interests is not an improper or unreasonable interference in the administration of the prison. Mr. Chief Justice Burger has written that

[i]t is obviously correct that no one acquires a vested or protected right in violation of the Constitution by long use, even when that span of time covers our entire national existence and indeed predates it.

Walz v. Tax Comm'n, 397 U.S. 664, 678, 90 S.Ct. 1409, 1416, 25 L.Ed.2d 697 (1970). This rule is coincidental with the understanding that what the due process clause of ". . . the Fourteenth Amendment exacts from the States is a conception of fundamental justice", Foster v. Illinois, 332 U.S. 134, 136, 67 S.Ct. 1716, 1717, 91 L.Ed. 1955 (1947), and, further, it ". . . exacts from the States for the lowliest and the most outcast all that is 'implicit in the concept of ordered liberty.'" Wolf v. Colorado, 338 U.S. 25, 27, 69 S.Ct. 1359, 1361, 93 L.Ed. 1782 (1949) quoting Palko v. Connecticut, 302 U.S. 319 at 325, 58 S.Ct. 149, 82 L.Ed. 288 (1937); see Shields v. Beto, 370 F.2d 1003 at 1004 (5th Cir. 1967).

■■ Liberty itself, even in the general population context of the state prison, is to some extent constitutionally protected and ". . . cannot be restricted except for a proper governmental objective." Cf. Bolling v. Sharpe, 347 U.S. 497, 499–500, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954). However, discipline within the prison is ipso facto a proper, substantial and valid governmental objective. But even though this objective is itself constitutionally permissible, the objective ". . . may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms." NAACP v. Alabama ex rel. Flowers, 377 U.S. 288, 307, 84 S.Ct. 1302, 1314, 12 L. Ed.2d 325 (1964). In obtaining the permissible end, the state agency must act consistently with the fundamental principles of justice which ". . . lie at the base of our civil and political institutions." Buchalter v. New York, 319 U.S. 427, 429, 63 S.Ct. 1129, 1130, 87 L. Ed. 1492 (1943). See also Cantwell v. Connecticut, 310 U.S. 296 at 304, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). Therefore,

[e]ven though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved.

Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960); see Keyishian v. Board of Regents, 385 U.S. 589 at 602, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967). This Court does not doubt that these principles have application in the prison disciplinary system. Haines v. Kerner, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972); Johnson v. Avery, 393 U.S. 483, 486, 89 S.Ct. 747, 21 L. Ed.2d 718 (1969); Board of Managers v. George, 377 F.2d 228 (8th Cir. 1967); cf. Cooper v. Pate, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964).

The basic question then becomes: What procedural due process standard is applicable?

### C. The Standard for Due Process

■■ Due process of law is a "summarized constitutional guarantee", Rochin v. California, 342 U.S. 165, 169, 72 S.Ct. 205, 96 L.Ed. 183 (1952), which ". . . deals neither with power nor with jurisdiction, but with their exercise." Kinsella v. United States, 361 U. S. 234, 246, 80 S.Ct. 297, 304, 4 L.Ed.2d 268 (1960). The clause, a component of

the Fourteenth Amendment, is itself a historical product and is not lightly to be taken to affect long standing practices, Jackman v. Rosenbaum Co., 260 U.S. 22, 31, 43 S.Ct. 9, 67 L.Ed. 107 (1922); but it is neither to be confined to "historical facts or discredited attitudes." Frank v. Maryland, 359 U.S. 360, 371, 79 S.Ct. 804, 3 L.Ed.2d 877 (1959). The phrase itself is of a conceptual nature which is less rigid and more fluid than others contained in the Bill of Rights. Betts v. Brady, 316 U.S. 455, 462, 62 S.Ct. 1252, 86 L.Ed. 1595 (1942). In Wolf v. Colorado, 338 U.S. 25, 27, 69 S.Ct. 1359, 1361, 93 L.Ed. 1782 (1949), Mr. Justice Frankfurter explained the flexible nature of the phrase.

> Due process of law thus conveys neither formal nor fixed nor narrow requirements. It is the compendious expression for all those rights which the courts must enforce because they are basic to our free society. But basic rights do not become petrified as of any one time, even though, as a matter of human experience, some may not too rhetorically be called eternal verities. It is of the very nature of a free society to advance in its standards of what is deemed reasonable and right. Representing as it does a living principle, due process is not confined within a permanent catalogue of what may at a given time be deemed the limits or the essentials of fundamental rights.

> To rely on a tidy formula for the easy determination of what is a fundamental right for purposes of legal enforcement may satisfy a longing for certainty but ignores the movements of a free society. It belittles the scale of the conception of due process. The real clue to the problem confronting the judiciary in the application of the Due Process Clause is not to ask where the line is once and for all to be drawn but to recognize that it is for the Court to draw it by the gradual

and empiric process of "inclusion and exclusion."

Subsequently, Mr. Justice Frankfurter in Rochin v. California, 342 U.S. 165 at 172, 72 S.Ct. 205 at 209, 96 L.Ed. 183. (1952), set out the mechanism for ascertaining the meaning of due process.

> In each case "due process of law" requires an evaluation based on a disinterested inquiry pursued in the spirit of science, on a balanced order of facts exactly and fairly stated, on the detached consideration of conflicting claims, . . . on a judgment not ad hoc and episodic but duly mindful of reconciling the needs both of continuity and of change in a progressive society.

In this case this Court has evaluated the meaning of due process in this manner. Thus, this Court presumes only to hold in this opinion that the requirements of due process, as hereinafter set out, are applicable exclusively in the prison context. See Betts v. Brady, 316 U.S. 455 at 462, 62 S.Ct. 1252, 86 L.Ed. 1595 (1942).

Mr. Justice Holmes has aptly written that " . . . what is due process of law depends on circumstances. It varies with the subject-matter and the necessities of the situation." Moyer v. Peabody, 212 U.S. 78, 84, 29 S.Ct. 235, 236, 53 L.Ed. 410 (1909). The beginning point in this determination is defining the " . . . precise nature of the government function involved as well as of the private interest that has been affected by governmental action." Cafeteria and Restaurant Workers Union v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961). In the prison context, as regards punitive segregation and lost gain time, the precise nature of the government function is punishment which can only rightly be explained and justified in rehabilitative terms. As regards administrative segregation, the precise nature of the government function is, as to the confined inmate, a matter of convenience to the

prison authority.[58] In each case the loss to the person so confined is great. In the prison context, except for the loss of life itself and except for the imposition of those conditions which would constitute cruel and unusual punishment in violation of the Eighth Amendment, confinement in punitive segregation is as loathsome and wretched as is legally permissible; there is nothing worse.[59] Administrative segregation is really only slightly different.[60] And, a loss of any type of gain time amounts to, in reality, an extension of incarceration. This is the nature of the private interest affected.

 Therefore, this Court holds that those conditions of human existence which accompany confinement in both disciplinary and administrative segregation and the loss of any type of gain time collectively and severally constitute grievous losses within the meaning of Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 168, 71 S.Ct. 624, 95 L.Ed. 817 (1951); and this Court further holds that these losses are of such a grievous nature that an inmate's interest in avoiding their unrightful imposition is such as to outweigh the governmental interest in a summary adjudication. *See* Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). *See also* Hannah v. Larche, 363 U.S. 420, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960). Therefore, this Court further holds that, prior to the imposition of these grievous losses, there must be a hearing appropriate to the nature of the loss. *See* Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950). See generally Teamsters Local 695 v. Vogt, 354 U.S. 284 at 287, 77 S.Ct. 1166, 1 L.Ed.2d 1347 (1957). A "progressive society" can require no less. *See* Rochin v. California, 342 U.S. 165 at 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952).

This understanding is not novel and has heretofore been applied in the prison context. Sostre v. McGinnis, 442 F.2d 178 (2d Cir. 1971); Jackson v. Bishop, 404 F.2d 571 (9th Cir. 1968) (Blackmun, J.); Jackson v. Godwin, 400 F.2d 529 (5th Cir. 1968); Krause v. Schmidt, 341 F.Supp. 1001 (W.D.Wis.1972); Urbano v. McCorkle, 334 F.Supp. 161 (D. N.J.1971); Landman v. Royster, 333 F. Supp. 621 (E.D.Va.1971); Bundy v. Cannon, 328 F.Supp. 165 (D.Md.1971); Clutchette v. Procunier, 328 F.Supp. 767 (N.D.Cal.1971), appeal docketed, No. 71–2357, 9th Cir., Aug. 30, 1971; Meola v. Fitzpatrick, 322 F.Supp. 878 (D. Mass.1971); Kritsky v. McGinnis, 313 F.Supp. 1247 (N.D.N.Y.1970); Washington v. Lee, 263 F.Supp. 327 (M.D. Ala.1966) aff'd per curiam 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968); *cf.* Haines v. Kerner, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972); Clayton v. Jones, 463 F.2d 1182 (5th Cir. 1972); Gray v. Creamer, 465 F.2d 179, 185 (3d Cir. 1972); Nolan v. Scafati, 430 F.2d 548 (1st Cir. 1970); Morales v. Schmidt, 340 F.Supp. 544 (W.D.Wis. 1972).

## IV. THE ELEMENTS OF DUE PROCESS IN THE PRISON

Although this Court has heretofore held· that the losses accompanying the

---

58. Section 5.14 of the Florida Division of Corrections—Inmate Treatment Directive No. 5 provides in part at page 11 that [i]nmates may be placed in administrative confinement for any of the following reasons:

(A) Awaiting disciplinary action;

(B) For investigation;

(C) For protection;

(D) At the inmate's own request;

(E) Pending trial for a crime committed in the institution;

(F) Custody risk who cannot be held in the regular inmate population;

(G) Inmates who after disciplinary confinement still cannot reasonably and safely be returned to the regular inmate population;

(H) Other reasons.

Item (H) "Other reasons" is without definition or description and has no meaning for this Court.

59. *See* note 18, *supra*.

60. *See* p. 1074, *supra*.

imposition of punitive and administrative segregation and of the loss of any type of gain time are grievous and therefore constitutionally protected by the Due Process Clause, it is the opinion of this Court that the distinctions between, on the one hand, punitive segregation and loss of any type of gain time and, on the other hand, administrative segregation are substantial enough to justify two sets of constitutionally required standards. *Cf.* Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed. 2d 484 (1972). In short, the conditions of administrative segregation are grievous, but those of punitive segregation and the loss of any type of gain time are more grievous.

A. *When the Grievous Loss is Confinement in Disciplinary Segregation or the Loss of Any Type of Gain Time*

Hereinafter set out are those requirements of procedural due process which are constitutionally required before the prison authority may impose on an inmate the status of punitive segregation, as heretofore defined, or before the prison authority may impose on an inmate the loss of any type of gain time. It should at the outset be noted that these requirements do not occasion the extension of a full panoply of the rights of judicial due process. *See* Goldberg v. Kelly, 397 U.S. 254 at 266, 90 S.Ct. 1011, 25 L.Ed.2d 491 (1970); Kritsky v. McGinnis, 313 F.Supp. 1247 at 1250 (N.D. N.Y.1970). In the opinion of this Court there is no good reason why these requirements cannot be administered with speed and relative ease.

1. *The Basic Characteristics of the Hearing*

 · In order to satisfy due process, a hearing must be meaningful, Gonzales v. United States, 348 U.S. 407, 415, 75 S.Ct. 409, 99 L.Ed. 467 (1955), which means that it must occur " . . . at a meaningful time and in a meaningful manner." Armstrong v. Manzo, 380 U. S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.

2d 62 (1965); *see* Goldberg v. Kelly, 397 U.S. 254, 267, 90 S.Ct. 1011, 25 L.Ed.2d 491 (1970). *See generally* Chambers v. Florida, 309 U.S. 227, 236–237, 60 S.Ct. 472, 84 L.Ed. 716 (1940); Hornsby v. Allen, 326 F.2d 605, 608 (5th Cir. 1964). The hearing must be both fair, Morgan v. United States, 304 U.S. 1, 14–15, 58 S.Ct. 773, 82 L.Ed. 1129 (1938), and just, Snyder v. Massachusetts, 291 U.S. 97, 107–108, 54 S.Ct. 330, 78 L.Ed. 674 (1934); and it must include the rudiments, Chicago, Milwaukee & St. Paul R. R. v. Polt, 232 U.S. 165, 168, 34 S. Ct. 301, 58 L.Ed. 554 (1914), rather than shock the sense, Galvan v. Press, 347 U.S. 521, 530, 74 S.Ct. 737, 98 L.Ed. 911 (1954), of fair play. Consequently, due process protects the individual against arbitrary action. Slochower v. Board of Higher Education, 350 U.S. 551, 559, 76 S.Ct. 637, 100 L.Ed. 692 (1956); Ohio Bell Telephone Co. v. Public Utilities Comm'n, 301 U.S. 292, 302, 57 S.Ct. 724, 81 L.Ed. 1093 (1937). *See also* Hannah v. Larche, 363 U.S. 420, 442, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960); Chambers v. Florida, 309 U.S. 227, 236–237, 60 S.Ct. 472, 84 L.Ed. 716 (1940); Hovey v. Elliott, 167 U.S. 409, 17 S.Ct. 841, 42 L.Ed. 215 (1897). Therefore, this Court holds that in the prison context the disciplinary hearing must be conducted at a meaningful time and in a meaningful manner so as to insure that it is fair, just and void of such arbitrary action that would result in an absence of fundamental justice. *See* Foster v. Illinois, 332 U.S. 134, 136, 67 S.Ct. 1716, 91 L.Ed. 1955 (1947); Shields v. Beto, 370 F.2d 1003, 1004 (5th Cir. 1967). Thus, a hearing before a prison disciplinary committee would normally be conducted with the dignity and under circumstances fitting other types of administrative hearings.

 This Court has considered the substantial burden which would be placed on the prison authority if this Court required widespread publication of this order and opinion in the various institutions of the Division of Corrections. However, it is certainly neces-

sary that inmates proceeded against have an appreciation of the hearing procedures. Therefore, it would be sufficient if, at the beginning of each hearing, a member of the disciplinary committee explained to the inmate proceeded against

> (1) the procedure to be followed at the hearing, and

> (2) the nature of the inmate's procedural rights, as provided for herein, to present his case and to protect his interests.

With regard to the inmate's election whether to make a statement, it would be necessary and essential that a member of the disciplinary committee explain to the inmate proceeded against that, as to any testimony which he might give, he is entitled to "use" immunity in a subsequent criminal prosecution to the extent that his statements shall not be used affirmatively against him. *See* part V. *infra.*

### 2. The Right to An Impartial Fact Finder

■■■ The Supreme Court speaking through Mr. Justice Black has nicely put it that

> [a] fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness. To this end no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome. That interest cannot be defined with precision.

In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955); *see* Tumey v. Ohio, 273 U.S. 510, 532, 47 S. Ct. 437, 71 L.Ed. 749 (1927). In short,

due process requires an impartial decision maker. *See* Goldberg v. Kelly, 397 U.S. 254, 301, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); Wong Yang Sun v. McGrath, 339 U.S. 33, 70 S.Ct. 445, 94 L. Ed. 616 (1950); Escalera v. New York City Housing Authority, 425 F.2d 853, 863 (2d Cir. 1970). And, " . . . justice must satisfy the appearance of justice." Offutt v. United States, 348 U.S. 11, 14, 75 S.Ct. 11, 13, 99 L.Ed. 11 (1954). These rules apply quite rigidly in the administrative context where many judicial safeguards are absent as a result of the interest in expedition and in administrative efficiency. *See* NLRB v. Phelps, 136 F.2d 562, 563 (5th Cir. 1943). Therefore, in the prison context, this Court holds that a disciplinary hearing must be held before an impartial fact finder and decision maker.

■■■ Under the facts of this case it is clear that the disciplinary committees [61] are exclusively composed of prison personnel. This Court holds that a member of a disciplinary committee is disqualified from service thereon in any and every case in which

> (1) he has participated as an investigating or reviewing officer, or

> (2) he is a witness, or

> (3) he is a person charged with a subsequent review of the decision, or

> (4) he has any personal knowledge of any material fact, or

> (5) he has any prior material involvement, or

> (6) he has any personal interest in the outcome.

The inmate " . . . is entitled to a neutral and detached judge in the first instance." Ward v. Village of Monroeville, 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972). Such rules have been heretofore implemented in prison disciplinary proceedings.[62] *See* United

---

61. The Court includes within the ambit of this term the "classification teams" or any other panels whatsoever when they function in the prison disciplinary context. See Florida Division of Corrections —Inmate Treatment Directive No. 5 at 3–4.

62. *See id.* at 4. "No committee or team member will aid in the determination of a matter in which he is involved as a complainant, witness or investigator but may be called upon for testimony."

States ex rel. Neal v. Wolfe, 346 F.Supp. 569, 574–575 (E.D.Pa.1972); Landman v. Royster, 333 F.Supp. 621, 653 (E.D. Va.1971); Clutchette v. Procunier, 328 F.Supp. 767, 784 (N.D.Cal.1971), appeal docketed, No. 71–2357, 9th Cir., Aug. 30, 1971; Morris v. Travisono, 310 F.Supp. 857, 872 (D.R.I.1970).

 Of course, this Court recognizes the substantial issue as to whether prison officials can ever so divorce themselves from intra-prison happenings as to be sufficiently impartial. However, this Court is not prepared to hold that persons from without the prison must serve as disciplinary committee members, since this Court is convinced in the good faith efforts of the prison authority to implement these requirements. Also, it has not been shown that prison personnel cannot be impartial, and it is evident that these persons have such experience and expertise as to make them well qualified to serve.[63]

 This Court is satisfied that there is no reason to require that a specific number of persons serve on a disciplinary committee and finds that the present procedure, which provides for three members, is constitutionally permissible.

 Finally, this Court holds that the selection of the composition of the disciplinary committees must be without regard to race, creed, color, religious belief or national origin.

### 3. *Notice*

 An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.

Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314, 70 S.Ct. 1166, 1 L.Ed.2d 1347 (1950); Armstrong v. Manzo, 380 U.S. 545, 550, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965); Potter v. Castle Construction Co., 355 F.2d 212, 215 (5th Cir. 1966); see Twining v. New Jersey, 211 U.S. 78, 110–111, 29 S.Ct. 14, 53 L.Ed. 97 (1908); *cf.* Gonzales v. United States, 348 U.S. 407, 75 S.Ct. 409, 99 L.Ed. 467 (1955). *See generally* Hovey v. Elliott, 167 U.S. 409, 413–415, 17 S.Ct. 841, 42 L.Ed. 215 (1897). There is no principle of due process more clearly established. Cole v. Arkansas, 333 U.S. 196, 201, 68 S.Ct. 514, 92 L.Ed. 644 (1948). The right to notice may not be taken away, Snyder v. Massachusetts, 291 U.S. 97, 105, 54 S.Ct. 330, 78 L.Ed. 674 (1934), for there can be no due process without it. MacKenna v. Ellis, 263 F.2d 35, 43 (5th Cir. 1959). The notice itself must be adequate, Hornsby v. Allen, 326 F.2d 605, 608 (5th Cir. 1964), which means that it must fully advise the party proceeded against of the allegations comprising the claim against him. Commissioner v. West Production Co., 121 F.2d 9, 11 (5th Cir. 1941). The notice must also be timely in the sense that it be delivered " . . . sufficiently in advance of the hearing to permit preparation." In re Gault, 387 U.S. 1, 33, 87 S.Ct. 1428, 1446, 18 L.Ed.2d 527 (1967). *See also* Goldberg v. Kelly, 397 U.S. 254, 267–268, 90 S.Ct. 1011, 25 L.Ed.2d 491 (1970).

The requirement of notice has generally been applied to disciplinary proceedings in the prison context. United States ex rel. Neal v. Wolfe, 346 F.Supp. 569, 574 (E.D.Pa.1972); Bundy v. Cannon, 328 F.Supp. 165, 172 (D.Md.1971); Meola v. Fitzpatrick, 322 F.Supp. 878, 886 (D.Mass.1971); *cf.* Sostre v. McGinnis, 442 F.2d 178, 198 (2d Cir. 1971); Nolan v. Scafati, 430 F.2d 548 (1st Cir. 1970). In order to simplify the requirement, other courts have defined some necessary elements of notice, *e. g.*, Landman v. Royster, 333 F.Supp.

---

63. This Court notes with interest the discussion of "Hearing Officers" in Bundy v. Cannon, 328 F.Supp. 165, 174 (D.Md. 1971). The usage of such hearing officers would be clearly preferable.

621, 653 (E.D.Va.1971) (notice must be written, must state the substance of the factual charge of misconduct, and must allow for a reasonable interval to prepare defense); Sinclair v. Henderson, 331 F.Supp. 1123, 1129 (E.D.La.1971) (notice must be official and written and must state specific charge); Clutchette v. Procunier, 328 F.Supp. 767, 782 (N. D.Cal.1971), appeal docketed, No. 71–2357, 9th Cir., Aug. 30, 1971, (notice must include statement of facts upon which charge is based and name and number of rule allegedly broken and be delivered at least seven days in advance); Morris v. Travisono, 310 F. Supp. 857, 870 (D.R.I.1970) (notice must be timely received in writing and, when classification downgrading is to be considered, must inform inmate of right to assistance by classification counselor).

 Under the facts of this case and the applicable law this Court holds that notice, in order to be both adequate and timely, must

 (1) be in writing, and

 (2) be personally delivered to the charged inmate, and

 (3) allow a reasonable interval of time for the inmate's preparation of his defense [64], and

 (4) include a statement of facts which substantially sets out the factual basis for the charge of misconduct, and

 (5) state the name and number of the offense charged.

### 4. The Right to be Heard and to Present Evidence

 In explaining why "[t]he fundamental requisite of due process of law is the opportunity to be heard", Grannis v. Ordean, 234 U.S. 385, 394, 34 S.Ct. 779, 783, 58 L.Ed. 1363 (1914),

Mr. Justice Cardozo wrote for the Court that

> [c]learly the end and aim of an appearance before the court must be to enable an accused . . . to explain away the accusation. The charge against him may have been inspired by rumor or mistake or even downright malice. He shall have a chance to say his say before the word of his pursuers is received to his undoing.

Escoe v. Zerbst, 295 U.S. 490, 493, 55 S.Ct. 818, 820, 79 L.Ed. 1566 (1935). Consequently, the right to be heard is an indispensable requisite to due process, and it is basic to our system of jurisprudence. Cole v. Arkansas, 333 U.S. 196, 201, 68 S.Ct. 514, 92 L.Ed. 644 (1948); In re Oliver, 333 U.S. 257, 273, 68 S.Ct. 499, 92 L.Ed. 682 (1948). The right to a full hearing includes the right to present evidence, Morgan v. United States, 304 U.S. 1, 18, 58 S.Ct. 773, 82 L.Ed. 1129 (1938), for the evidence is offered to support the contentions Hornsby v. Allen, 326 F.2d 605, 608 (5th Cir. 1964). See generally Goldberg v. Kelly, 397 U.S. 254, 267–268, 90 S.Ct. 1011, 25 L.Ed.2d 491 (1970); Armstrong v. Manzo, 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965); Gonzales v. United States, 348 U.S. 407, 75 S.Ct. 409, 99 L.Ed. 467 (1955); Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 70 S.Ct. 1166, 1 L.Ed.2d 1347 (1950); United States v. Dillman, 146 F.2d 572, 574 (5th Cir. 1944); Commissioner v. West Production Co., 121 F.2d 9, 11 (5th Cir. 1941); cf. Hovey v. Elliott, 167 U.S. 409, 413–414, 17 S.Ct. 841, 42 L.Ed. 215 (1897). A number of courts have applied this right in the context of prison disciplinary proceedings. United States ex rel. Neal v. Wolfe, 346 F.Supp. 569, 574 (E.D.Pa.1972); Sostre v. McGinnis, 442 F.2d 178, 198 (2d Cir.

---

64. Nothing in this requirement or in any other part of this opinion should be construed so as to prevent the prison authority from placing in immediate isolation any inmate whose continued "freedom" poses an immediate threat of violence or disruption to himself, other inmates, prison officials or the prison generally. However, an appropriate hearing should be conducted at the earliest practicable time. See part IV, B in text of opinion.

1971); Landman v. Royster, 333 F. Supp. 621, 653 (E.D.Va.1971); Sinclair v. Henderson, 331 F.Supp. 1123, 1129 (E.D.La.1971); Clutchette v. Procunier, 328 F.Supp. 767, 783 (N.D.Cal.1971), appeal docketed, No. 71–2357, 9th Cir., Aug. 30, 1971; Meola v. Fitzpatrick, 322 F.Supp. 878, 886 (D.Mass.1971); Kritsky v. McGinnis, 313 F.Supp. 1247, 1250 (N.D.N.Y.1970); Morris v. Travisono, 310 F.Supp. 857, 873 (D.R.I.1970).

 This Court holds that in the prison disciplinary context an inmate has the right to be heard and the right to support his contentions with evidence. The right to be heard shall be taken to mean that the inmate shall be afforded a reasonable opportunity to explain his conduct and the relevant circumstances. The right to support his contentions with evidence shall be taken to mean that an accused inmate may offer up real evidence for consideration and may call voluntary witnesses to testify for him. In so holding this Court in no way limits the inherent power of the fact finder and decision maker (the disciplinary committee) to restrict questions and answers to relevant matter, to preserve decorum and to limit repetition.

### 5. The Right to Confrontation and Cross-Examination

 For two centuries past, the policy of the Anglo-American system of Evidence has been to regard the necessity of testing by cross-examination as a vital feature of the law. The belief that no safeguard for testing the value of human statements is comparable to that furnished by cross-examination, and the conviction that no statement . . . should be used as testimony until it has been probed and sublimated by that test, has found increasing strength in lengthening experience.

V. J. Wigmore, A Treatise on the Anglo-American System of Evidence § 1367 at 28–29 (3d ed. 1940). Although cross-examination is generally a vital feature of the fact finding procedure in any tribunal, it is of fundamental importance in administrative proceedings wherein the ordinary rules of procedure are relaxed. Southern Stevedoring Co. v. Voris, 190 F.2d 275, 277 (5th Cir. 1951); cf. ICC v. Louisville & Nashville R. R., 227 U.S. 88, 93, 33 S.Ct. 185, 57 L.Ed. 431 (1913). This rule is applicable in prison disciplinary proceedings wherein, as hereinafter set out, the rules of evidence are substantially relaxed.

 Secondly, the right to a hearing embraces " . . . a reasonable opportunity to know the claims of the opposing party and to meet them", Morgan v. United States, 304 U.S. 1, 18, 58 S.Ct. 773, 776, 82 L.Ed. 1129 (1938), and this minimally includes a right to examise adverse witnesses. In re Oliver, 333 U.S. 257, 273, 68 S.Ct. 499, 92 L.Ed. 682 (1948); cf. Reilly v. Pinkus, 338 U.S. 269, 70 S.Ct. 110, 94 L.Ed. 63 (1949); Hornsby v. Allen, 326 F.2d 605, 608 (5th Cir. 1964). Absent confrontation and cross-examination, it is manifest that the party proceeded against is without knowledge of the adverse evidence and cannot, therefore, maintain his rights or make his defense. ICC v. Louisville & Nashville R. R., 227 U.S. 88, 93–94, 33 S.Ct. 185, 57 L.Ed. 431 (1913). Consequently, his presence is " . . . a condition of due process to the extent that a fair and just hearing would be thwarted by his absence. . . . " Snyder v. Massachusetts, 291 U.S. 97, 107–108, 54 S.Ct. 330, 333, 78 L.Ed. 674 (1934). Therefore, an inmate's presence is required at every step in the disciplinary hearing where adverse evidence is presented to the fact finder and decision maker so that he is thereby afforded an effective opportunity to defend. Cf. Goldberg v. Kelly, 397 U.S. 254, 267–268, 90 S.Ct. 1011, 25 L.Ed.2d 491 (1970). Of course, subsequent to the hearing, when the disciplinary committee proceeds to make its decision, the inmate may be removed.

Mr. Chief Justice Warren has succinctly put the supporting rationale.

Certain principles have remained relatively immutable in our jurisprudence.

One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue. While this is important in the case of documentary evidence, it is even more important where the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy. We have formalized these protections in the requirements of confrontation and cross-examination. They have ancient roots. They find expression in the Sixth Amendment which provides that in all criminal cases the accused shall enjoy the right "to be confronted with the witnesses against him." This Court has been zealous to protect these rights from erosion. It has spoken out not only in criminal cases . . . [citing], but also in all types of cases where administrative and regulatory actions were under scrutiny.

Greene v. McElroy, 360 U.S. 474, 496–497, 79 S.Ct. 1400, 1413–1414, 3 L.Ed.2d 1377 (1959).

■ This Court is not insensitive to the substantive arguments which might be advanced in support of a position urging that confrontation and cross-examination should not be included as necessary due process elements. For example, this Court appreciates the concern of prison officials that interrogation by an inmate of a custodial official may be at variance with the normal authoritarian relationship. Also, this Court appreciates the substantial, subsequent repercussions which may flow from the knowledge by the inmate or his friends

that another inmate has squealed. However, this Court nevertheless concludes and holds that the imposition of disciplinary segregation or the loss of any type of gain time is so grievous that an inmate must be afforded the rights of confrontation and cross-examination.[65] *See* United States ex rel. Neal v. Wolfe, 346 F.Supp. 569, 574–575 (E.D.Pa.1972); Colligan v. United States, 349 F.Supp. 1233 (E.D.Mich.1972); *see* Landman v. Royster, 333 F.Supp. 621, 653 (E.D.Va. 1971); Clutchette v. Procunier, 328 F. Supp. 767, 782–783 (N.D.Cal.1971), appeal docketed, No. 71–2357, 9th Cir., Aug. 30, 1971; *cf.* Sostre v. McGinnis, 442 F.2d 178, 198 (2d Cir. 1971). *See also* Willner v. Committee on Character & Fitness, 373 U.S. 96, 103–104, 83 S. Ct. 1175, 10 L.Ed.2d 224 (1963). Again, this Court admonishes that the fact finder and decision maker has the intrinsic power to restrict questioning to relevant matters, to preserve decorum and to limit repetition.

### 6. *Counsel and Counsel Substitute*

■ This Court is aware that "[t]he right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel." Powell v. Alabama, 287 U.S. 45, 68–69, 53 S.Ct. 55, 64, 77 L.Ed. 158 (1932). See also In re Oliver, 333 U.S. 257, at 273, 68 S.Ct. 499, 92 L.Ed. 682 (1948). However, this Court is not convinced that there is a right to the appointment of counsel in prison disciplinary proceedings. *Contra* Clutchette v. Procunier, 328 F.Supp. 767, 778, 783 (N.D.Cal.1971), appeal docketed, No. 71–2357, 9th Cir., Aug. 30, 1971 (counsel necessary in circumstances wherein offense will be referred to the state's prosecuting authority). But this Court is also aware that an inmate proceeded against may be one of the class of functionally illiterate prisoners [66] who can-

---

65. Obviously, if the enumerated problems are deemed too great by the prison authority, the inmate may be confined in administrative segregation under the procedures hereinafter set out. *See* part IV, B in text of opinion.

66. *See* Adderly v. Wainwright, 272 F.Supp. 530 (M.D.Fla.1967); Adderly v. Wainwright, 58 F.R.D. 389 (M.D.Fla.1972).

not, with reasonable adequacy, aid themselves in disciplinary proceedings. *See generally* Johnson v. Avery, 393 U.S. 483, 487, 489, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969). Therefore, this Court holds that, although there is no duty under these circumstances [67] upon the state to furnish counsel, an inmate must be allowed in prison disciplinary proceedings to retain an attorney if he so desires or to have the assistance of voluntary counsel substitute if he so desires. *See* Landman v. Royster, 333 F.Supp. 621, 654 (E.D.Va.1971); Clutchette v. Procunier, 328 F.Supp. 767, 783 (N.D.Cal. 1971), appeal docketed, No. 71-2357, 9th Cir., August 30, 1971; Morris v. Travisono, 310 F.Supp. 857, 872 & 873 (D.R.I.1970) (assistance by classification officer); Colligan v. United States, 349 F.Supp. 1233 (E.D.Mich.1972); *cf.* Goldberg v. Kelly, 397 U.S. 254, 270–271, 90 S.Ct. 1011, 25 L.Ed.2d 491 (1970); Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969). Counsel substitute could be either a willing inmate or a prison official, so long as there is no conflict of interest. If counsel is retained, there might be justification for a minimal continuance of the hearing date which could be granted by the disciplinary committee.

### 7. *Requirements of the Decision*

Any decision of the fact finder and decision maker must rest solely upon evidence adduced at the hearing, Goldberg v. Kelly, 397 U.S. 254, 271, 90 S.Ct. 1011, 25 L.Ed.2d 491 (1970); for a finding without evidence would exceed its power, United States v. Abilene & Southern R. R., 265 U.S. 274, 288, 44 S.Ct. 565, 68 L.Ed. 1016 (1924), and would constitute a denial of due process. *Cf.* Thompson v. Louisville, 362 U.S. 199, 206, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960); Hornsby v. Allen, 326 F.2d 605, 608 (5th Cir. 1964). Therefore, this Court holds that in the context of prison disciplinary proceedings the fact finder and decision maker cannot properly consider any evidence other than that presented at the disciplinary hearing and that a decision must be based on substantial evidence. *See* Landman v. Royster, 333 F.Supp. 621, 653 (E.D.Va. 1971); Clutchette v. Procunier, 328 F.Supp. 767, 783–784 (N.D.Cal.1971), appeal docketed, No. 71–2357, 9th Cir., Aug. 30, 1971; Morris v. Travisono, 310 F.Supp. 857, 873 (D.R.I.1970); *cf.* Kritsky v. McGinnis, 313 F.Supp. 1247, 1250 (N.D.N.Y.1970).

Second, in order to demonstrate compliance with this requirement, this Court holds that the fact finder and decision maker must state briefly the reasons for the decision and the evidence on which it relied. Colligan v. United States, 349 F.Supp. 1233 (E.D.Mich. 1972), see Goldberg v. Kelly, 397 U.S. 254, 271, 90 S.Ct. 1011, 25 L.Ed.2d 491 (1970); *cf.* Wichita R. R. & Light Co. v. Public Utilities Comm'n, 260 U.S. 48, 58, 43 S.Ct. 51, 67 L.Ed. 124 (1922). This statement need not be in any great detail; it must simply demonstrate the basis for the decision. *See also* Rodriguez v. McGinnis, 307 F.Supp. 627 (N.D.N.Y.1969).

Third, in order to demonstrate that all of the hereinbefore and hereinafter requirements are met, this Court holds that some type of record of the proceedings must be made and retained as a part of the inmate's prison record. Such a record could, but need not, be a transcript as it is known in the courts; a simple tape recording, for example, would be sufficient. The advantage of such a record is clear. Without some elementary record, the simple failure of human memory would in many cases tend to cloud the ability to determine the actual happenings. A record kept in the regular course of business provides prima facie evidence which would enable any decision maker to determine whether compliance has been had with these due process standards. In short, a record is essential as it tends to insure

---

67. *See* part V in text of opinion.

that the hearing is both full and fair. *See* part IV, A, 10, a, *infra.*

### 8. *Appeal*

■ It is clear from the Administrative Rules and Regulations of the Department of Health and Rehabilitative Services Governing the Division of Corrections at 10B–3.06(3) [68] and the Florida Division of Corrections Inmate Treatment Directive No. 5 at 6 [69] that there is no appellate procedure, as such, from disciplinary proceedings. However, it is clear that the written report of the disciplinary committee is submitted for approval and review in two steps; first, the report is submitted to the institution superintendent and, second, the report is in turn submitted to the office of the Director of the Florida Division of Corrections.[70] This Court finds nothing in law to support the conclusion that, absent any other considerations, an appellate procedure is an essential element of procedural due process in the prison context.

However, it is clear that, if applicable prison regulations or directives extend to inmates a right to appeal, then all inmates must be treated alike, Clutchette v. Procunier, 328 F.Supp. 767 (N.D.Cal. 1971), appeal docketed, No. 71–2357, 9th Cir., Aug. 30, 1971; *cf.* Douglas v. California, 372 U.S. 353, 83 S.Ct. 814, 9 L. Ed.2d 811 (1963); and, if authorities in the prison system review the report, recommendations or findings of the various disciplinary committees, then that review must be strictly confined to the entire record. Thus, a review must not go beyond the perimeters of the record, but it must also be based on the whole record. Just as it would be prejudicial to submit on review only certain parts of the evidence presented, it would also be prejudicial to submit any items whatsoever beyond the ambit of the record in the case *See* Landman v. Royster, 333

F.Supp. 621, 653–654 (E.D.Va.1971). *See also* Morris v. Travisono, 310 F. Supp. 857, 873 (D.R.I.1970). The rationale supporting this rule is obvious:

> [i]t is as much a violation of due process to send an accused to prison following conviction of a charge on which he was never tried as it would be to convict him upon a charge that was never made.

Cole v. Arkansas, 333 U.S. 196, 201, 68 S.Ct. 514, 517, 92 L.Ed. 644 (1948).

This limitation, however, in no way condemns a review procedure which comports with these requirements; for meaningful review can certainly result in a more considered exercise of power and can effect elimination of errors. *See* Wright v. McMann, 321 F.Supp. 127, 145 (N.D.N.Y.1970).

### 9. *The Rules of Prohibited Conduct*

It is certainly true in the non-prison world that definiteness in a statute is required by the due process clause before a person may be held criminally responsible. Thus, if a statute ". . . fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute", United States v. Harriss, 347 U.S. 612, 617, 74 S.Ct. 808, 812, 98 L.Ed. 989 (1954); *see* Palmer v. City of Euclid, 402 U.S. 544, 91 S.Ct. 1563, 29 L.Ed.2d 98 (1971); Bouie v. Columbia, 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964), then it is vague and standardless and, as such, void for vagueness. *See* Giaccio v. Pennsylvania, 382 U.S. 399, 86 S.Ct. 518, 15 L.Ed.2d 447 (1966).

■■ This Court holds that in the prison context it is constitutionally required by the due process clause that the rules specifying prohibited conduct and the range of penalties for their infraction be written with reasonable specificity so that the inmate has fair warning

---

68. Filed herein as respondent's Exhibit No. C.

69. Filed herein as respondent's Exhibit No. B.

70. Apparently, the Director has delegated his duties in this regard to the Deputy Director for Inmate Treatment.

to conform. Such fair warning requires that the rules must somehow be communicated to those so required to conform. *See* Landman v. Royster, 333 F.Supp. 621, 654–656 (E.D.Va.1971); Sinclair v. Henderson, 331 F.Supp. 1123, 1129 (E. D.La.1971); Rhem v. McGrath, 326 F. Supp. 681, 691 (S.D.N.Y.1971). *See also* Colligan v. United States, 349 F. Supp. 1233 (E.D.Mich.1972). This rule is, in addition to the constitutional mandate based on a conception of fundamental fairness, supported by the following considerations: first, prior notice of behavioral standards enhances the inmate's sense of fair play and thus contributes to rehabilitation; second, equal treatment of similar conduct of offending inmates by the prison authority will be more certain; third, clear rules may tend to decrease dissatisfaction with the disciplinary processes to such an extent that litigation may decrease; and fourth, since prison life is highly routine, it would not appear to be a heavy burden to require the prison authority to establish in advance reasonably clear rules. Notification of the inmates of the rules could be perfected by publishing the rules at several convenient locations in the prison to which the inmates have full access.

### 10. *Other Considerations*

#### a. *Public Hearing*

■ This Court has considered, and hereby rejects, the theory that a right to a public hearing in prison disciplinary proceedings is encompassed within the due process clause of the Fourteenth Amendment as the record requirement, *see supra* part IV, A, 7, will tend to insure that the hearing will be fundamentally fair. Thus, there is no necessity for a public hearing on the basis that such a requirement is necessary in order to insure that the hearing will be full and fair. *See generally* In re Oliver, 333 U.S. 257 at 273, 68 S.Ct. 499, 92 L. Ed. 682 (1948); Chambers v. Florida, 309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716 (1940); Morgan v. United States, 304

U.S. 1, 58 S.Ct. 773, 82 L.Ed. 1129 (1938).

#### b. *Rules of Evidence*

■ This Court is of the opinion that there is no necessity for imposing in these administrative proceedings any requirements with regard to the rules of evidence. *See* Goldberg v. Kelly, 397 U. S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 491 (1970); United States v. Abilene & S. Ry. Co., 265 U.S. 274, 44 S.Ct. 565, 68 L.Ed. 1016 (1924); ICC v. Louisville & Nashville R. R. Co., 227 U.S. 88, 33 S.Ct. 185, 57 L.Ed. 431 (1913); Hornsby v. Allen, 326 F.2d 605 (5th Cir. 1964). With regard to whatever evidentiary scheme is utilized, it is only necessary that the substantial rights of the parties are not infringed, Crowell v. Benson, 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1932), and that the proceedings be conducted consistent with fundamental principles which inhere in due process of law. Southern Stevedoring Co. v. Voris, 190 F.2d 275 (5th Cir. 1951).

### B. *When the Grievous Loss is Confinement in Administrative Segregation*

Hereinafter set out are those requirements of procedural due process which are constitutionally required before the prison authority may impose on an inmate the status of administrative segregation, as heretofore defined. These requirements are abbreviated and, obviously, may be administered with speed and relative ease.

■ It should be made clear at the outset that these requirements must under normal circumstances and normal conditions be met prior to the inmate's confinement in administrative segregation. However, *under emergency condition caused by such occurrences as riots or rebellion by prisoner groups or under conditions wherein a prisoner is exhibiting violent and ungovernable tendencies, these requirements need only occur within a reasonable period subsequent to the placing of the inmate in a segregated*

*status.*[71] Whether such a time period is reasonable would depend on the then existing circumstances.

■ This Court holds, on the basis of the authorities and reasoning herein, before set out, that it is constitutionally necessary that the following requirements be satisfied prior to placing an inmate in an administrative segregation status:

(1) The inmate must be afforded before an officer of the prison a fair hearing which must occur at a meaningful time and in a meaningful manner.

(2) At the hearing the inmate must be informed by such officer of the reason for his confinement in administrative segregation and must be allowed an opportunity to be heard.[72]

(3) The officer who conducts the hearing must be impartial and must have the authority to reverse the theretofore made decision to confine the inmate in administrative segregation.

In reaching this result, this Court has considered the relevant circumstances and the need to accommodate a mechanism for administratively segregating inmates with the necessities in this context of due process. *See* Goldberg v. Kelly, 397 U.S. 254, 262–263, 90 S.Ct. 1011, 25 L.Ed.2d 491 (1970); Cafeteria & Restaurant Workers Union v. McElroy, 367 U.S. 886, 895, 86 S.Ct. 1743, 6 L.Ed.2d 1230 (1961); Hannah v. Larche, 363 U.S. 420, 442, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960). *See also* Colligan v. United States, 349 F.Supp. 1233 (E.D.Mich.1972); Morris v. Travisono, 310 F.Supp. 857, 871–875 (D.R.I.1970).

*Compare* Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).

## V. CRIME AND INTRA–PRISON DISCIPLINE

Obviously, many prison disciplinary offenses also constitute crimes. For example, the murder of a guard by an inmate or the beating of an inmate or another person in the prison fall within this category. Just as the state has an interest in proceeding in a criminal action against the responsible person, the prison authority continues in such a period to have an interest in preserving order in the prison and dispensing discipline to the offending inmate.[73]

In the Florida prison system, the Division of Corrections has mandated an affirmative duty upon prison officials to report criminal offenses to the appropriate prosecuting authority.

The superintendent or officer-in-charge shall report criminal offenses committed by inmates to the appropriate prosecuting attorney.

Administrative Rules and Regulations of the Department of Health and Rehabilitative Services Governing the Division of Corrections § 10B–3.06(15) at 7 (respondent's Exhibit No. C).

■ Under such circumstances, the prison authority may in its discretion proceed internally to discipline the inmate for his violation of prison rules. If so, then at the disciplinary hearing the inmate is faced with a substantial dilemma.[74] In choosing whether to exercise his right to be heard at the disciplinary hearing, the inmate—assuming *arguendo* the presence of *Miranda* [75]

71. *See* Williams v. Wainwright, 350 F. Supp. 33 (M.D.Fla.1972).

72. With regard to the inmate's election whether to make a statement, it would be necessary that the officer conducting the hearing explain to the inmate that, as to any statement which he might give at the hearing, he is entitled to "use" immunity in a subsequent criminal prosecution to the extent that his statements shall not be used affirmatively against him. *See* part V *supra* in text

73. The issue of whether such dual proceedings—one criminal and one disciplinary—constitute double punishment is not presently before this Court.

74. The facts in the instant case nicely put the issue, for Sands was charged, *inter alia*, with "assault on other inmates".

75. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

warnings and "custody"—prejudices himself. If he remains silent, he sacrifices a valuable defense and risks a substantial and serious punishment. If he speaks in his defense, he risks self-incrimination in a subsequent criminal prosecution.

▉ ·In Clutchette v. Procunier, 328 F.Supp. 767 at 778 (N.D.Cal.1971), appeal docketed, No. 71–2357, 9th Cir., Aug. 30, 1971, the court found that, since in California prisons *Miranda* warnings are required, People v. Dorado, 62 Cal.2d 338, 42 Cal.Rptr. 169, 398 P.2d 361 (1965), counsel was indispensable and, therefore, constitutionally required in order to protect the rightful interests of the inmate in avoiding an inadvertent imposition of disciplinary measures. This Court, however, rejects this conclusion with deference since it is yet not certain that even counsel can adequately resolve the very real problem of the inmate.[76] Obviously, counsel's assistance would enable an inmate to utilize more effectively his rights. However, when the time comes at the hearing for the inmate proceeded against to make a statement, the assistance of counsel cannot vitiate the constitutionally obnoxious dilemma: it is then still as substantial as if the attorney were not there.

▉ This Court recognizes that the threat of an imposition of solitary confinement or the loss of any type of gain time may operate to coerce a waiver of the Fifth Amendment privilege against self-incrimination and that, on the other hand, an inmate who chooses to remain silent is stripped of his most valuable defense. In either event, the dilemma is ". . . likely to exert such pressure upon an individual as to disable him from making a free and rational choice." Miranda v. Arizona, 384 U.S. 436, 464–465, 86 S.Ct. 1602, 1623, 16 L.Ed.2d 694 (1966). Therefore, this Court concludes and holds that, with regard to testimony

given at any type of prison disciplinary proceedings including those in which the grievous loss is, as heretofore defined, punitive segregation, administrative segregation or the loss of any type of gain time, the inmate therein proceeded against is in each such case entitled to "use" immunity in a subsequent criminal prosecution to the extent that his statements shall not be used affirmatively against him. *Accord,* Carter v. McGinnis, 351 F.Supp. 787 (W.D.N.Y. 1972). *See* Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); Garrity v. New Jersey, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967); Spevack v. Klein, 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967); *cf.* Melson v. Sard, 131 U.S. App.D.C. 102, 402 F.2d 653 (1968). *See also* Kastigar v. United States, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). It is simply intolerable that one constitutional right should have to be surrendered in order to assert another.

The result of this rule accommodates the interests of the parties as well as justice. The inmate is free to be heard in his defense in the disciplinary proceedings while the state is free to promote prison discipline and to protect its interest in the prosecution of crime.

## VI. NONRETROSPECTIVE APPLICATION

▉ This case only affects the instant plaintiff, any cases involving these issues which have heretofore been filed and any disciplinary proceedings occurring subsequent to, but not including, the date of this order and opinion. *See generally* Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966); Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965).

---

76. This Court has no doubt that such an inmate would be "in custody" for *Miranda* purposes. Further, it is of course certain that, if *Miranda* warnings are not given, any statement made could not be affirmatively used by the prosecution in a subsequent criminal prosecution.

## VII. OTHER CONSIDERATIONS

 This Court recognizes that segregated confinement does not *per se*, in and of itself, violate the Constitution, Sostre v. McGinnis, 442 F.2d 178, 192 (2d Cir. 1971); Burns v. Swenson, 430 F.2d 771, 777 (8th Cir. 1970); Courtney v. Bishop, 409 F.2d 1185, 1187 (8th Cir. 1969); Graham v. Willingham, 384 F.2d 367, 368 (10th Cir. 1967); *cf.* Young v. Wainwright, 449 F.2d 338 (5th Cir. 1971), that incarceration brings about a necessary withdrawal of many privileges and rights, Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948); Jackson v. Bishop, 404 F.2d 571, 576 (8th Cir. 1968); Jackson v. Godwin, 400 F.2d 529, 532 (5th Cir. 1968), and that it is not desirable for a federal court to supervise the continuous operation of a prison. Granville v. Hunt, 411 F.2d 9 (5th Cir. 1969); Courtney v. Bishop, 409 F.2d 1185 (8th Cir. 1969); Jackson v. Godwin, 400 F.2d 529 (5th Cir. 1968); Landman v. Peyton, 370 F.2d 135 (4th Cir. 1966). However, it is certainly true that incarceration does not mean prisoners have no constitutional rights. Haines v. Kerner, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed. 2d 652 (1972); Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969); Courtney v. Bishop, 409 F.2d 1185 (8th Cir. 1969); Jackson v. Bishop, 404 F.2d 571 (8th Cir. 1968); *cf.* Williams v. Wainwright, 461 F.2d 1080 (5th Cir. 1972). Thus, in this case this Court has sought with considerable care and thoughtfulness to determine the limits of constitutional protections with regard to prison disciplinary proceedings. Undoubtedly, judicial resolution of these issues of constitutional import will be beneficial, for to date the prison authority has been disadvantaged by a lack of a clear understanding of minimal requirements since there has not heretofore in Florida been decided a case of comprehensive scope.

\* \* \*

██ ██ Apart from, but in addition to, all of the hereinbefore set out considerations, this Court is of the opinion that ". . . '[a] prisoner retains all the rights of an ordinary citizen except those expressly or by necessary implication, taken from him by law.' " Jackson v. Godwin, 400 F.2d 529, 532 (5th Cir. 1968) *quoting* Coffin v. Reichard, 143 F.2d 443, 445 (6th Cir. 1944). *See also* Washington v. Lee, 263 F.Supp. 327 at 331 (M.D.Ala.1966), aff'd per curiam 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 122 (1968). The courts have a duty to protect prisoners ". . . from unlawful and onerous treatment of a nature that, of itself, adds punitive measures to those legally meted out by the court." Jackson v. Godwin, 400 F.2d 529, 532 (5th Cir. 1968).

Under our system of law, it seems reasonably clear that there are three basic purposes supporting the concept of confinement punishment: retribution, deterrence and rehabilitation. S. Rubin, The Law of Criminal Correction 646 (1963) (Chapter 18 by H. Weihofen).[77] Segregation should perhaps be added to this list, for there seems little doubt that an objective of sentencing judges in a large number of cases is simply to segregate for a period of time the criminal from society. However, this purpose is probably incident to deterrence.

Absent other considerations, it is not facially apparent that these purposes are conflicting. However, in those cases in which these purposes are conflicting, there seems to be no set priority. Therefore, in those circumstances where these purposes cannot conveniently accommodate each other, prison authorities and parole boards are left with the problem of determining priorities. *See* L. Hall & S. Glueck, Cases on Criminal Law and its Enforcement 15 (2d ed. 1958). The Supreme Court has to some extent considered and resolved this problem in noting that

---

77. *See also* ALI Model Penal Code Art. 1 (1961).

[r]etribution is no longer the dominant objective of the criminal law. Reformation and rehabilitation of offenders have become important goals of criminal jurisprudence.

Williams v. New York, 337 U.S. 241, 248, 69 S.Ct. 1079, 1084, 93 L.Ed. 1337 (1948).

The philosophical basis justifying incarceration, so long as it is conducive to reformation, has long been understood.

The penitentiary was one of the products of the social and humanitarian revolution that contributed so generously to the founding of the American nation. The philosophical concepts of natural and equal rights as advanced by Montesquieu, Voltaire, Rousseau, and their rationalistic followers were applied to the crime problem by the thoughtful Italian, Cesare Beccaria. His famous *Essays on Crimes and Punishments*, first published in 1764, clearly reasoned that punishment can be just and effective only . . . when confinement in a humane environment encourages the prisoner to reform.

B. McKelvey, American Prisons—A Study in American Social History Prior to 1915 at 1 (1968). This concept is not limited to the writers but is understood by correctional officials themselves even in the context of prison discipline.

Discipline with the immediate aim of good order and good conduct, moreover, must look beyond the limits of the inmate's term of confinement. It must seek to insure carry-over value by inculcating standards which the inmate will maintain after release. The ultimate aim of discipline is individual self-reliance, self-control, self-respect and self-discipline; it is not merely the person's ability to conform to institutional rules and regulations but his ability and desire to conform to accepted standards for individual and community life in free society.

American Correctional Association, A Manual of Correctional Standards 347 (1954).[78] This rehabilitative goal of prison discipline has been adopted by the Florida Division of Corrections. ". . . [T]he general purpose of discipline is directed toward the development of patterns of behavior which will be of help to the inmate in his future adjustment in the community." Florida Division of Corrections—Inmate Treatment Directive No. 5 at 1 (respondent's Exhibit No. B).

Aside from however discredited is the concept of retribution, *see* Williams v. New York, 337 U.S. 241, 248, 69 S.Ct. 1079, 93 L.Ed. 1593 (1948); O. Holmes, The Common Law 45 (1881), it is clear that to some extent the purposes of retribution and deterrence are satisfied when a person is incarcerated. Therefore, it may then be properly argued that the intra-prison environment and social structure need only accommodate the purposes of rehabilitation. But to

---

**78.** This understanding is not novel to correctional officials. In 1870 the leaders of what is now known as the American Correctional Association adopted a "Declaration of Principles" which provided in part that " . . . the supreme aim of prison discipline is the reformation of criminals, not infliction of vindictive suffering." Transactions of the National Congress of Penitentiary and Reformatory Discipline at 541 (1870) (Wines ed. 1871) cited in S. Rubin, The Law of Criminal Correction 665 (1963) (Chapter 18 by H. Weihofen).

With regard to prison discipline, the President's Commission on Law Enforcement and Administration of Justice has concluded that

. . . a first principle of any correctional institution is that staff control can be greatest, and certainly inmate life will be most relevant to that in the free community, if rules regulating behavior are as close as possible to those which could be essential for law and order in any free community, together with such minimal additional rules as are essential to meet the conditions peculiar to the institution.

The President's Commission on Law Enforcement and Administration of Justice, Task Force Report: Corrections 50 (1967).

the extent that rehabilitation conflicts with either retribution or deterrence, it is the opinion of this Court that rehabilitation must be considered the primary objective and must, therefore, prevail. Rehabilitation is the only one of these three philosophies that is both consistent with the spirit of a democratic culture and protective of the public: rehabilitation is an effort so to deal with a law violator that he will not commit further crime. *See* S. Rubin, The Law of Criminal Correction at 665–66 & 693 (1963).

The essence of the procedural requirements, hereinabove set out based on the Fourteenth Amendment, is that the prison disciplinary system must be fundamentally fair. Wholly apart from the Fourteenth Amendment mandate, however, is the consideration of the applicability of the Eighth Amendment. Certainly it is true that "[a] person who receives what he considers unfair treatment from correctional authorities is likely to become a difficult subject for reformation." The President's Commission on Law Enforcement and Administration of Justice, Task Force Report: Corrections 83 (1967); *see* Jackson v. Godwin, 400 F.2d 529, 535 (5th Cir. 1968). And, although the result surely cannot be certain, fundamentally fair treatment of inmates by the correctional authority is likely to promote rehabilitation.

If, however, fair treatment is denied the inmate, it may be fairly argued that the inmate is, to that extent, denied rehabilitation. And, since the rehabilitative goal is of benefit to the individual as well as to our society, it may be argued that the denial of rehabilitation con-

stitutes an affirmative imposition of cruel and unusual punishment in violation of the Eighth Amendment.[79] After all, "[t]he [Eighth] Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958).

Therefore, it is

Ordered:

1. That a declaratory judgment is hereby granted to the plaintiff in accordance with the foregoing opinion.

▇▇▇ 2. That defendant Louie L. Wainwright, his agents, employees and attorneys, and all persons in active concert and participation with him, be and hereby is restrained and enjoined from enforcing the loss to the plaintiff John A. Sands of one hundred twenty (120) days gain time which was occasioned by a disciplinary report dated November 16, 1970, and by disciplinary committee action therein dated November 20, 1970.

3. That the United States Marshal for the Middle District of Florida, or his authorized representative, is hereby directed to personally serve forthwith a certified copy of this order and opinion on the defendant Louie L. Wainwright, Director, Florida Division of Corrections, Farris Bryant Building, Tallahassee, Florida; on L. L. Dugger, Superintendent, Union Correctional Institution, Raiford, Florida; on R. D. Massey, Superintendent, Florida State Prison, Starke, Florida; and on D. D. Bachman, Deputy Director for Inmate Treatment, Florida Division of Corrections, Farris Bryant Building, Tallahassee, Florida.

---

79. The same reasoning applies to an argument based on an objection to monetary expenditures for rehabilitative programs. Long ago, it may have been necessary to limit rehabilitative programs for want of economic resources. However, it would appear untenable for one to argue that the affluent society cannot now afford such expenditures.